UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW GARSHOTT                                  Case No. 13-15085

                                                 Paul D. Borman
              Plaintiff,                         United States District Judge

v.

ST. CLAIR COUNTY SHERIFF'S
DEPUTY O'DONNELL, ET AL.,

              Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO 14) AND DISMISSING DEFENDANT DEPUTY MILLER WITHOUT PREJUDICE

        This civil rights action was filed on December 16, 2013 against Defendants Deputy
Timothy O'Donnell, Deputy Miller, and St. Clair County based on the events arising out of
Plaintiff Andrew Garshott's arrest and tasering on January 1, 2013.  (ECF No. 1.)

        Now before the Court is Defendants St. Clair County and Deputy Timothy O'Donnell's
Motion for Summary Judgment that was filed on January 30, 2015.  (ECF No. 14.)  After
unsuccessful settlement negotiations, Plaintiff filed a late response to the Motion for Summary
Judgment on July 13, 2015.  Defendants then filed their reply on July 20, 2015.  (ECF No. 19.)

        A hearing on this matter was held on September 15, 2015.  For the reasons set forth
below, the Court will grant Defendants' Motion for Summary Judgment.

# I. FACTUAL BACKGROUND

A.      Plaintiff's January 1, 2013 Arrest

On December 31, 2012, Plaintiff was at A.J.'s Salt Docks Bar and Restaurant, a restaurant he owns and operates in Cottrellville Township, Michigan.  That night, A.J.'s hosted a New Year's Eve party.  (Def.'s Ex. 2, Incident Report at 3.)[1]  Plaintiff, a large man weighing 260 lbs and with a history of three assault convictions, had consumed almost two bottles of wine. (*Id.* at 13; Ex. 1, Garshott Dep. at 50-60.)  Around 11:20 p.m., a cook employed by Plaintiff, Nicholas Baker, called the police from the parking lot of A.J.'s Salt Docks and reported that he had been physically assaulted by Plaintiff after advising Plaintiff he was leaving for the evening. (Incident Report at 4.)  Defendant O'Donnell responded to the call.

Upon arrival, Defendant O'Donnell interviewed Baker in the parking lot of A.J.'s Salt Docks and observed abrasions on Baker's face and his shin.  (Ex. 3, O'Donnell Dep. at 10.) Baker related to Defendant O'Donnell that Plaintiff was extremely intoxicated and had attacked him by punching and kicking him.  (*Id.*; Incident Report at 4; Ex. 4, Baker Statement.)  Baker also explained to Defendant O'Donnell that Plaintiff was frequently intoxicated when he worked at AJ's.  (*Id.*)  Shortly thereafter, another employee, Kaitlyn Wendt, came out of AJ's and advised Defendant O'Donnell that Plaintiff was drunk and was being belligerent to customers and staff, had shoved her, and thrown a beer bottle at a patron and at the band.  (O'Donnell Dep. at 13-14; Ex. 5, Wendt Statement.)

---

[1] Unless otherwise noted, all references to exhibits refer to those exhibits attached to Defendants' Motion for Summary Judgment.

2

Plaintiff then exited AJ's and Wendt identified him to Defendant O'Donnell.  (O'Donnell Dep. at 17-18.)  Around this time, Deputy Miller arrived at the restaurant.  (O'Donnell Dep. at 19.)  Plaintiff approached the two deputies and spoke to them regarding Baker's allegations but denied that he had assaulted anyone.  (Garshott Dep. at 109.)  Plaintiff produced his license to Defendant O'Donnell and at the same time pulled out a rubber-banded wad of money from his pocket.  (Id. at 110-11.)  Plaintiff denied that this was an attempt to bribe the officers but acknowledged that Defendant O'Donnell advised him that the issue was not going to go away. (*Id*. at 111.)

Eventually, Defendant O'Donnell instructed Plaintiff to sit on a bench by the front door of the restaurant.  (*Id*.)  Plaintiff testified at his deposition that he sat down as directed but then got up and attempted to go back in the restaurant.  (*Id*. at 112-13.)  At that point, Plaintiff testified that he was tased in the back and he fell on the icy ground.  (Garshott Dep. at 113-14.) Plaintiff then repeatedly testified that he did not remember any events after that point.  (*Id*. at 71, 113, 115, "I don't remember after they shot me [with a taser]," "that's all I remember, and smashing my head on the pavement," "Q: And then you fell? A: That's all I remember there.")

Despite testifying that he had no memory after being tased, Plaintiff went on to explain that once he was on the ground an officer jumped on his back before he was tased again.  (*Id*. at 116-117.)  Plaintiff also testified that he was tased "three, four five times."  (*Id*. at 116.)  Plaintiff was eventually pepper sprayed once.  (*Id*.)   Plaintiff lost consciousness after being pepper sprayed.  (*Id*. at 117-18.)  Plaintiff also had no memory of the officers attempting to put handcuffs on him but did recall that he had one arm under his body after he fell to the ground. (*Id*.)  When Plaintiff regained consciousness he was handcuffed in the police car.  (*Id*. at 118-

3

2:13-cv-15085-PDB-MKM   Doc # 23   Filed 03/09/16   Pg 4 of 20   Pg ID 384

19.)  Plaintiff testified during his deposition that he "never resisted."  (*Id*. at 119:17.)

Plaintiff's girlfriend and employee, Rozann Medelis, was also at AJ's that night and observed some of the pertinent events.  Medelis corroborated that Plaintiff had consumed two bottles of wine.  (Ex. 10, Medelis Dep. at 23.)  At some point during the night, Medelis looked out the door of the restaurant and saw Plaintiff in the parking lot talking with Defendant O'Donnell.  (*Id*. at 32; *see also* Ex. 9, Medelis Police Statement.)  Medelis came out and spoke with Defendant O'Donnell and he assured her that everything was fine.  (*Id*.)  She then gave Plaintiff a hug and returned to the restaurant.  (*Id*. at 34.)

Later, Medelis looked out the restaurant's door and saw Plaintiff, with one arm in a handcuff, laying on the ground with two officers on top of him.[2]  (*Id*. at 40, 46, 61-62.)  Medelis testified that when she saw him for the first time he had already been tased.  (*Id*. at 39-41.)  Medelis testified that Plaintiff screamed "they're going to kill me!"  (*Id*. at 45.)  Medelis ran outside and advised Plaintiff to relax and that it was going to be okay.  (*Id*. at 51-52; Ex. 9, Medelis Statement at 1-2.)  Medelis noted that the officers were struggling to put the second handcuff on Plaintiff.  (Medelis Dep. at 45-46.)

Medelis saw Defendant O'Donnell use the taser on Plaintiff in drive stun mode near his neck or upper part of his shoulder which caused two items to fly out of the scrum and land at her feet.  (*Id*. at 46-48, 60, 62-63.)  She picked up the items believing they belonged to Plaintiff,

---

[2] Medelis authored a signed statement for police later that night which stated when she looked out the door of the restaurant she saw Plaintiff "resisting arrest."  (Medelis Dep. at 39; Ex. 9, Medelis Statement.)  Medelis testified during her deposition that she did not see Plaintiff "resist" and that she wrote the term "resisting arrest" because the officer had used the words to describe Plaintiff's actions: "He didn't tell me, make me, anything like that.  But, yes, he told me that's what [Plaintiff] was doing, so that word was in my head from the officer."  (Medelis Dep. at 39, 54:3-6.)

4

however, she later learned the items were parts of Defendant O'Donnell's taser.  (*Id*. at 47-48,

56-57.)  Defendant O'Donnell yelled at her to drop the items and threw her to the ground.  (*Id*. at

47.)  Medelis claims she dropped the items when instructed.  (*Id*. at 57.)  Medelis only saw

Plaintiff tased once but did see an officer use pepper spray.  (*Id*. at 58, 62-64.)

An ambulance was called (Medelis Dep. at 80) and Plaintiff had his eyes irrigated while

handcuffed (Garshott Dep. at 118-19.)  Both Plaintiff and Medelis were eventually taken to jail

where they both remained for three days.[3]

Defendant O'Donnell testified to a different version of the events surrounding Plaintiff's

arrest and tasering.  Defendant O'Donnell testified that after questioning Plaintiff he instructed

Plaintiff to sit on a bench near the restaurant but Plaintiff refused.  (O'Donnell Dep. at 27-28.)

Defendant O'Donnell then told Plaintiff that he would have to sit in the police car while the

officers went in the restaurant.  (*Id*. at 28.)  Defendant O'Donnell left Plaintiff with Deputy

Miller and retrieved his car and parked it close to the front door of the restaurant.  (*Id*. at 29.)

Thereafter, Defendant O'Donnell tried to guide Plaintiff to the car but Plaintiff stated that he did

not want to go and then tried to move backwards.  (*Id*. at 30.)  Then, Plaintiff tried to turn around

despite Defendant O'Donnell's instructions to get in the car and to cooperate with the officers.

(*Id*. at 30-31.)

At that point, Defendant O'Donnell decided to place Plaintiff under arrest because of his

resistence and grabbed his right wrist in an attempt to guide him the car, but Plaintiff resisted the

_____

[3] The Court notes that Plaintiff testified that he was left in soiled clothes for the three
days he remained in jail.  (Garshott Dep. at 23, 128.)  However, during cross-examination,
Plaintiff admitted that he was provided jail clothing and underwear upon arrival at the jail and he
wore that unsoiled clothing for the three days he was in jail.  (*Id*. at 133-34.)

maneuver so Defendant O'Donnell forcibly took Plaintiff to the ground to handcuff him.  (*Id*. at 33-34.)  Deputy Miller indicated in his report that during the take down maneuver, Plaintiff slipped on the ice and fell to the ground.  (Incident Report, at 10.)  While straddling Plaintiff, who was on the ground on his stomach, Defendant O'Donnell testified that he put Plaintiff's right wrist in a handcuff and instructed Plaintiff to stop resisting and to give him his left arm. (O'Donnell Dep. at 36-37.)  However, Defendant O'Donnell claimed that Plaintiff's left arm was under his body and Plaintiff continued to struggle.  (*Id*.)

Defendant O'Donnell testified that he warned Plaintiff that he would be tasered if he did not comply but Plaintiff failed to give up his arm for handcuffing.  (*Id*. at 42-43.)  Thereafter, Defendant O'Donnell used his taser in drive stun mode on Plaintiff, applying the taser once to Plaintiff's upper back in the shoulder blade area.  (*Id*.)  Plaintiff's reaction to the taser knocked the taser from Defendant O'Donnell's hand which resulted in Defendant O'Donnell also being tased.  (*Id*. at 43-44.)  After the taser flew from Defendant O'Donnell's hands, Medelis picked it up.  (*Id*. at 44.)  Then, Defendant O'Donnell got off of Plaintiff and retrieved the taser from Medelis, whom he advised was under arrest and instructed her not to leave the area.  (O'Donnell Dep. at 45.)

While Defendant O'Donnell was engaged with Medelis, Deputy Miller used his taser on Plaintiff because he continued to struggle.  (Incident report at 10-11.)  Deputy Miller then tased Plaintiff a second time when he tried to get up from the ground but Plaintiff disconnected the wires to the taser by rolling round on the ground.  (Incident Report at 10-11.)

After retrieving his taser, Defendant O'Donnell resumed his position of straddling Plaintiff, who was still on the ground lying on his stomach with his left arm beneath him.

6

(O'Donnell Dep. at 46.)  Defendant O'Donnell then used one burst of pepper spray on Plaintiff's face.  (*Id*. at 38-39, 45-47.)  Plaintiff stopped moving and Deputy Miller then placed a second set of handcuffs on Plaintiff's left hand and connected the two sets together.  (O'Donnell Dep. at 48; Incident Report at 11.)

B.     Later Proceedings

After his arrest, Plaintiff was charged with two counts of assault and battery, one count of resisting and obstructing an officer, and one count of bribery of a police officer.  (Ex. 2, Incident Report at 9.)  On May 6, 2013, Plaintiff pled guilty to one count of assault and battery, Mich. Comp. Laws § 750.81, and attempted resisting and obstructing of a police officer, Mich. Comp. Laws § 750.81d.  (Ex. 6, Plea Hrg. Trans.; Ex. 7, Judgment of Sentence.)  Medelis was convicted of obstruction.  (Medelis Dep. at 49.)

Plaintiff testified at his plea hearing that he had "drank almost two bottles of wine" that night.  (Plea Hearing at 8.)  Plaintiff also admitted under oath that assaulted Baker.  (Plea Hearing at 9.)  As to Plaintiff's conduct with the officers, Plaintiff testified that he was "very upset over the whole situation" and that he "may not have cooperated with them fully."  (*Id*. at 9.)  Plaintiff further testified that:

Q:     Is it fair to say that you got a little upset because they were going to arrest you?

A:     Yes.

Q:     And you may have at this point not wanted to go and you struggled a little bit with them?

A:     I slipped on the ice, yes.

Q:     Okay.  And in the end they actually pulled a taser and actually tazed [sic] you; is that correct?

A:      Yes. Multiple times.

Q:      Is it fair that originally when they grabbed you and you were going back
        to the car that's when everyone slipped; is that correct.

A:      Yes, right at the front door of the building, yes
.
Q:      So you didn't cooperate fully with them, at least when looking at it from
        their perspective; is that a correct statement?

A:      Yes.

(*Id.* at 9-10.)  Plaintiff testified during his deposition that he could not remember what he told the

judge during his plea hearing but that he would not have lied.  (Garshott Dep. at 74-75.)

Plaintiff also pled no contest to six of ten statutory violations regarding his liquor license

before an Administrative Law Judge ("ALJ") for the Liquor Control Commission.  (Garshott

Dep. at 77, 80-81; Ex. 8, Liquor Control Commission Violation Report and Findings of Fact, at

4-7.)  The charges that Plaintiff pled no contest to included: "annoying and/or molesting of an

employee, Nicholas Baker" and failing "to cooperate with law enforcement officers and/or

obstructed law enforcement officers in the course of inspecting or investigating the licensed

premises."  (Liquor Control Commission Violation Report, at 1.)

In its Findings of Fact and Conclusions of Law issued on May 13, 2013, the ALJ found

that "Garshott attempted to bribe the deputies with money to end the investigation.  The deputies

rejected the bribe.  Then, Garshott attempted to obstruct the investigation.  He was arrested by

the deputies because of his conduct."  (*Id.* at 5.)  Ultimately, Plaintiff was sentenced to a fine.

(*Id.*)

8

## II. STANDARD OF REVIEW

Defendants have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material"  for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable

9

inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### III. ANALYSIS

A.    Defendant Miller

As an initial matter, Defendants assert that Defendant Deputy Miller was never served with the complaint and summons in this action.  Indeed, there is no certificate of service filed on the docket evidencing that Defendant Deputy Miller was served.  Despite Defendants raising this issue in their Motion for Summary Judgment, Plaintiff failed to rebutted or address this claim in his response or during oral argument.  Federal Rules of Civil Procedure 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or its own after notice to the plaintiff – must dismiss the action without prejudice against that

defendant or order service be made within a specific time." Fed. R. Civ. P. 4(m).[4]  Rule 4(m)

further provides that a court must extend the time for service if the plaintiff can show good cause

for the failure.  *Id.*

  The Court finds that the time to serve Defendant Deputy Miller has long passed and,

despite notice, Plaintiff has not shown good cause for the failure or requested an extension of

time to serve Defendant Deputy Miller.  Accordingly, the Court will dismiss Defendant Deputy

Miller without prejudice from this action.

B.  County of St. Clair and Other Claims against Defendant O'Donnell

  During oral argument the Plaintiff dismissed his state law claims against Defendant

O'Donnell and his claims against the County of St. Clair; the parties represented to the Court

that the *only* remaining viable claim was a claim of excessive force against Defendant Timothy

O'Donnell.  Thus, the Court will DISMISS WITH PREJUDICE the state law claims against

Defendant O'Donnell and all claims asserted against Defendant County of St. Clair.

  The Court also notes that it was unclear from Plaintiff's complaint whether his claims of

false arrest and false imprisonment were made only pursuant to state law or were also asserted

pursuant to 42 U.S.C. § 1983.  Defendant assumed that these claims were federal claims and

argued that such claims failed as a matter of law in their Motion for Summary Judgment.

Plaintiff failed to address or rebut the federal false arrest and false imprisonment claim in his

response.

---

  [4] The Court recognizes that the time limit for service was shortened to 90 days under
Rule 4(m) effective December 15, 2015.  Plaintiff's complaint, however, was filed in 2013 prior
to the effective date of that amendment.

Given the parties' representation during oral argument that the only claim left before this Court is Plaintiff's claim that Defendant Timothy O'Donnell violated Plaintiff's Fourth Amendment right to be free from excessive force pursuant to 42 U.S.C. § 1983, the Court finds that to the extent Plaintiff did attempt to assert a federal false arrest or false imprisonment claim, that claim is similarly conceded and DISMISSED WITH PREJUDICE.

C.      *Heck v. Humphrey*, 512 U.S. 477 (1994)

Defendants argue that Plaintiff cannot assert an excessive force claim against Defendant O'Donnell because Plaintiff pled guilty to attempted obstructing and resisting of an officer pursuant to Mich. Comp. Laws § 750.81d in state court, and therefore his federal claim is barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). The Sixth Circuit has explained:

> In *Heck*, the Supreme Court held that a plaintiff cannot assert a § 1983 claim if success on that claim would "necessarily imply" the invalidity of an underlying state criminal conviction, unless the plaintiff can "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."

*Hayward v. Cleveland Clinic Foundation*, 759 F.3d 601, 608 (6th Cir. 2014) (quoting *Heck*, 512 U.S. at 486-87). "[I]n this Circuit, if a plaintiff asserts a claim that contradicts an element of an underlying criminal offense, or if that claim could have been asserted in criminal court as an affirmative defense, *Heck* applies to bar the § 1983 suit." *Id*. at 609.

However, as set forth *infra* in Subsection D, the Court finds that Plaintiff is not entitled to relief under § 1983 even if his claims are not barred by *Heck*. Accordingly, the Court will bypass the *Heck* analysis and proceed to the merits of Plaintiff's excessive force claim. *Polzin v. Gage*, 636 F.3d 834, 837-38 (7th Cir. 2011) (Recognizing that "[t]he *Heck* doctrine is not a

12

jurisdictional bar" and holding that "district courts may bypass the impediment of the *Heck* doctrine and address the merits of the case.") (citing *Jiron v. City of Lakewood*, 392 F.3d 410, 413 n. 1 (10th Cir. 2004) (finding same)); *see also Brown v. Hill*, 438 F. App'x 336 (5th Cir. 2011).

D.     Defendant Deputy O'Donnell

In order to make a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish a violation of an existing constitutional right by a person acting under color of state law.[5]  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).  Section 1983, however, does not confer any substantive rights but rather affords a means to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).  Here, Plaintiff claims that Defendant O'Donnell violated his constitutional right to be free from wrongful seizure, false arrest and excessive force pursuant to the Fourth Amendment.

"'[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard ...'"  *Schreiber v. Moe*, 596 F.3d 323, 331-32 (6th Cir. 2010) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  To make a showing of excessive force "[u]nder the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants."

---

[5] In the present case, it is undisputed that Defendant O'Donnell was operating under the color of state law.  Therefore, the Court's inquiry only addresses whether any clearly established actionable constitutional violations occurred.

13

*Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)); *see also Graham*, 490 U.S. at 396-97.  Three factors guide the Court's analysis in this inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)); *see Graham*, 490 U.S. at 396.  This inquiry must be "assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight."  *Burgess*, at 473 (citing *Graham*, 490 U.S. at 396-97); *accord Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).  A court must also carefully balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake."  *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006). "Ultimately, the court must determine 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Goodwin v. Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (citation omitted)).

Defendant O'Donnell argues that regardless of whether Plaintiff's constitutional rights were violated he is entitled to qualified immunity.  The doctrine of qualified immunity generally protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of qualified immunity is to "shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  This doctrine protects government officials from civil liability unless, "in

14

the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009).

A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2080 (2011) (citation omitted). The order of the inquiry is no longer mandatory and Courts are allowed to use their discretion in deciding which of the two steps of the qualified immunity analysis should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Once a government official has raised the defense of qualified immunity the plaintiff "'bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity.'" *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005)); *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S.Ct. at 2083 (citation omitted); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014).

1.      Constitutional Violation

"A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." *Morrison v. Board of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002). Here,

15

both parties treat the altercation as one single episode rather than attempting to parse Defendant O'Donnell's actions.  The Court agrees with the parties' treatment of the issue and analyzes the events as one episode.

As set forth above, three factors guide the Court's analysis the objective reasonableness of the force used: the severity of the crime, whether the plaintiff posed an immediate threat to the officers, and whether the plaintiff was actively resisting or attempting to flee.

Here, assuming the facts in a light most favorable to Plaintiff, the Court concludes that a constitutional violation did not occur.  First, Defendant O'Donnell was informed by two separate employees that Plaintiff had assaulted them that evening.  And, it is not disputed that Plaintiff weighed approximately 260 lbs, stood 5 feet and eleven inches tall, and had consumed almost two bottles of wine that evening.  In sum, he was a very large, intoxicated man accused of assaulting multiple people and acting in an erratic manner.  Plaintiff also admitted at various times under oath that he was "upset," that he did not fully cooperate with the officers, and he admittedly attempted to leave the area after being told to sit on a bench by the officers.  All of these facts support a finding that Plaintiff posed an immediate threat to Defendant O'Donnell and others when he attempted to leave the scene and when he refused let himself be handcuffed.

Finally, it is uncontradicted that Plaintiff actively resisted arrest by refusing to give up his arm to be handcuffed or follow Defendant O'Donnell's orders to do the same.  Plaintiff cannot contradict this fact as he testified that he has no memory of that time period or of the officers attempting to administer handcuffs while he was on the ground.  (*See* Garshott Dep. at 117-18.) Plaintiff also admittedly tried to leave the scene.  Further, his girlfriend's account of the events supports the fact that Plaintiff actively resisted Defendant O'Donnell's attempts at handcuffing. Medelis testified that after seeing Plaintiff on the ground under the officers, she ran outside and

16

instructed Plaintiff to "relax" while the officers were attempting to handcuff him.  (Medelis Dep. at 53.)  Medelis also described the fact that the officers had continued to struggle to get Plaintiff into handcuffs while he was on the ground, and administering a taser and pepper spray.  (Medelis Dep. at 45-46, 53; Medelis Statement at 1-2.)

Plaintiff argues in his Response that there is significant evidence that Defendant O'Donnell used excessive force but then fails to specify any such evidence.  (Pl.'s Resp. at 16.) Plaintiff also argues that Defendant O'Donnell's actions were "inherently unreasonable" without any argument or analysis.  The Court notes that upon a motion for summary judgment the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts which demonstrate that there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  Plaintiff's cursory and conclusory statements do not meet this standard.

In conclusion, the Court finds the facts in the record clearly depict a situation in which Defendant O'Donnell was faced with a very large, intoxicated man accused of assaulting people and acting in an erratic manner who tried leave the scene without permission.  Plaintiff also actively resisted Defendant O'Donnell's attempts to subdue him and administer handcuffs.

In *Caie v. West Bloomfield*, 485 F. App'x 92, 94, 96-97 (6th Cir. 2012), the Sixth Circuit held that an officer's use of a taser was reasonable when the suspect was "highly intoxicated" and "actively resist[ed] the officer's attempts to secure his arms behind his back."  *See also Williams v. Sandel*, 433 F. App'x 353, 354 (6th Cir. 2011) (finding the use of batons, pepper stray, and 37 taser strikes to be reasonable when the suspect was high on drugs, nude and running on a highway in the middle of the night.)  Similarly, in this action Defendant O'Donnell's use of his taser and pepper spray was reasonable because Plaintiff was a large, intoxicated man who continued to resist handcuffing by keeping his arm under his body.  The

17

Court notes that there is no claim of gratuitous force *after* the handcuffs were applied.

Accordingly, the Court finds that no constitutional violation occurred and summary judgment is appropriate.

2.     Clearly Established Right

The Court also finds that even if it were to assume that a constitutional violation did occur, Defendant O'Donnell is entitled to qualified immunity because the constitutional right in this context was not clearly established.  "Even if a plaintiff can establish the violation of a constitutional right by an officer, he must additionally establish that the right was clearly established at the time of violation in order to avoid dismissal on the grounds of immunity." *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007).  As noted *supra*, an official's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *al-Kidd*, 131 S.Ct. at 2083 (citation omitted).

In determining whether a constitutional right is clearly established, "the Supreme Court has 'repeatedly' warned lower courts not to define the right at 'a high level of generality.'" *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) (quoting *al-Kidd*, 131 U.S. at 2084).  The Sixth Circuit has instructed courts to strive for "an appropriate middle ground" when defining the constitutional right that is neither too general, nor too factually narrow.  *Id.* at 508-09.  The Court determines that the appropriate inquiry is whether in January 2013 it was clearly established that using a taser and pepper spray on a large and assaultive suspect who attempted to leave the scene and then actively resisted arrest by refusing to be handcuffed constituted excessive force.

18

In *Correa*, the Sixth Circuit summarized the state of clearly established rights to be free of taser shock as of May, 2010:

> this Court's analysis of whether a defendant's right to be free from a taser shock was clearly established can be split into two lines of cases. First, this Court has generally found no clearly-established right where the suspect is actively resisting arrest, which can include physically resisting, fleeing the scene despite police orders, and not responding to orders to move.
>
> In a second set of cases, this Court has found that plaintiffs' right to be free from a taser shock is clearly established where they have done nothing to resist or are already detained. ... In some cases, tasing a previously resistant and violent suspect who no longer poses a threat to the police officers also violates clearly established law.

*Correa*, 528 F. App'x at 535 (case citations omitted). The Sixth Circuit has "emphasized the concept of resistance when considering whether an officer's conduct violates established law." *Id*. In its 2012 *Hagans* decision, the Sixth Circuit explained that case law both "before and after May 2007, adhere to this line: If a suspect actively resists arrest and refused to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." 695 F.3d at 509 (collecting authority); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 643 (6th Cir. 2015) (holding that the precedent in the Sixth Circuit dictates: "that police officers can tase someone who resists lawful arrest and refuses to move his hands so the police can handcuff him." (citation omitted)). Additionally, the Sixth Circuit has defined active resistance to include fleeing. *Cockrell*, 468 F. App'x at 495 (holding that it was not a violation of clearly established right to use a taser on a "non-violent misdemeanant, fleeing from the scene of a non-violent misdemeanor.")

Given this case law, when Defendant O'Donnell, who learned of the violent assaults of two employee victims, was confronted with a rapidly evolving situation wherein a large, intoxicated suspect attempted to leave the scene and then actively resisted handcuffing, it cannot be said that every reasonable officer would have known that using a taser and pepper spray to

19

subdue that suspect amounted to unconstitutional force.  Therefore, Defendant O'Donnell is entitled to qualified immunity.

## IV. CONCLUSION

For all these reasons, the Court GRANTS Defendants' Motion for Summary Judgment (ECF No. 14).   The Court also DISMISSES Defendant Miller from this action without prejudice.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 9, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 9, 2016.


s/Deborah Tofil
Case Manager

20